IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,     )<br>                                                       )<br>           Plaintiff-Appellee,            )<br>                                                       )<br>           v.                                         )<br>                                                       )<br>SEAN P. DIX,                                 )<br>                                                       )<br>           Defendant-Appellant.       )<br>_____ ) | D.C. Number: CR F 05-0028 AWI<br><br>Mag. Number:04-0Mj-0140 WMW<br><br><br>ORDER ON APPELLANT'S<br>APPEAL OF MOTION TO<br>SUPPRESS |

    This is an appeal from a conviction for driving with a suspended license that occurred in Yosemite National Park. On January 19, 2005, Magistrate Judge Wunderlich denied Appellant Sean Dix's motion to suppress. The same day, Dix pled guilty. This appeal was filed on January 27, 2005, and challenges only the Magistrate's denial of the motion to suppress. On January 29, 2005, the Magistrate sentenced Dix to twelve months probation and a $500 fine, but stayed imposition of the fine pending appeal. This Court will affirm the Magistrate Court's ruling.

**FACTS**[1]

    On August 15, 2004, Yosemite Park Ranger Jason Gayeski-Peters ("Peters") was on duty and patrolling inside the park in a marked patrol vehicle. Suppression Hearing Transcript at 5. At approximately 10:00 p.m. and while driving southbound on Sentinel Drive, Peters came up

---

[1] The facts are taken from the transcript of the motion to suppress hearing.

1  behind a dark colored pickup truck. Id. The truck had no visible rear license plate. Id. Peters
2  testified that he has stopped vehicles in the past for a missing or improperly placed license plate
3  based solely on observation. Id. at 6-7. Peters followed the truck onto Southside Drive and
4  maintained a two car length distance. Id. at 7-8. Peters determined that the truck was traveling
5  between 10 and 15 m.p.h. even though the speed limit was 25 m.p.h. Id. at 7. That section of
6  Southside Drive has two lanes, but is a one way road (both lanes go in the same direction). Id. at
7  8. There are no street lights and it was dark outside. Id. at 19. Other than Peters's patrol car and
8  the truck, there appeared to be no other cars were in the area. Id. at 26. The truck was in the left
9  lane of Southside Drive, and Peters observed the truck weave within the left lane, cross the lines
10 separating the left lane from the right lane, and then move back into the left lane towards the left
11 white fog line. Id. at 7-8. Peters then observed the truck activate its right turn signal, change
12 lanes into the right lane, travel partially over a four inch concrete curb, and come to a stop with
13 part of the truck still in the right lane and the passenger portion of the truck approximately 2 to 3
14 feet onto the neighboring bicycle path. Id. at 8-9, 13. Prior to traveling over the concrete curb,
15 the truck had traveled a short distance in the right lane. Id. at 8-9. There was no shoulder on this
16 portion of Southside Drive for a car to pull onto if it needed to stop. Id. at 21, 30. Peters then
17 observed the driver of the truck stick his arm out of the window and motion for Peters to go
18 around. Id. at 9. Peters did not go around and instead stopped in the right lane and waited for the
19 truck to pull back onto road. Id. The truck later reentered the highway and, after driving
20 approximately 2/10 of a mile, Peters activated his overhead lights to effectuate a traffic stop. Id.
21 The truck pulled into the Housekeeping Camp parking lot and came to a stop. Id. The truck's
22 driver attempted to exit the truck, but Peters instructed the driver to remain in the vehicle and the
23 driver complied. Id. at 10, 26-27. Peters testified that he stopped the truck in order to investigate
24 the driver's driving behavior which suggested to Peters that the driver might be operating the
25 vehicle while impaired. Id. at 25-26.
26  　　　　After reporting the initial stop to dispatch, Peters approached the truck from the passenger
27
28

side. Id. at 13. Peters asked the truck's passenger, later identified as Cheryl O'Hara, to role down the window and Peters then identified himself to the driver, Sean Dix. Id. at 13-14. Along with Dix and O'Hara, there were two small boys in the backseat of the vehicle. Id. at 27. Peters explained that he had stopped the truck because he suspected that the Dix was operating a motor vehicle while impaired. Id. at 13-14. Peters then asked if Dix was under the influence of drugs and/or alcohol and Dix denied having had any alcohol or taken any drugs. Id. at 14, 27. Dix's speech was not slurred, Peters did not smell any odor of alcohol, and Peters did not request Dix to perform any field sobriety tests. Id. at 27-28. After Dix denied consumption of drugs and/or alcohol, Peters then requested Dix's driver's license, registration, and proof of insurance as part of Peters's standard procedure. Id. at 14, 28. Dix indicated that the truck had been recently purchased and that there was a temporary registration supplied by the dealer on the front passenger corner of the windshield. Id. at 14. Dix also provided Peters with proof of insurance and a driver's license. Id. Dix's driver's license, however, indicated that it had expired in 2000. Id. After receiving the driver's license and noticing the 2000 expiration date, Peters returned to his patrol car to check on the status of the license and to do a wants-and-warrants check. Id. Dispatch informed Peters that the license was suspended or revoked. Id. at 15. Peters then approached the driver's side of the truck and asked if Dix knew that the license was suspended. Id. Dix responded affirmatively. Id. Peters then issued two citations, one for driving with a suspended license and a second for failing to obey a traffic control device, i.e. crossing the fog line of the right lane as Dix stopped on the bike lane.[2] Id. at 19. Peters did not issue citations for driving below the speed limit, for having no rear license plate (Peters testified that, after investigation, there was simply no infraction), off-road travel, or any other infraction relating to pulling onto the bike path. Id. at 19-22.

        Cheryl O'Hara was the only witness called by the defense at the suppression hearing. She

---

[2]The prosecution exercised its discretion and did not file charges on the failure to obey traffic controls citation.

3

testified that Dix was driving fine and was not swerving, that the car was driving slowly because the patrol vehicle was following them and because they were looking for bears, that she was alert to how Dix was driving because of the patrol vehicle behind, that they were driving on the right lane when Dix motioned the patrol vehicle to go by, and the truck never went off the road onto the bike path.  Id. at 33-35, 38-39.

The prosecution argued that Peters had probable cause to make the stop since there was a potential license plate infraction and that Dix's driving behavior (driving below the speed limit for about 1 /2 mile, slowly weaving within the left lane, and pulling off the road onto the bike path) indicated that Dix was driving while impaired.  Id. at 43.  The defense argued that Peters had no reasonable suspicion for believing that Dix was driving while impaired, and that, once Peters ascertained that Dix had temporary registration, had not consumed alcohol or drugs, and was simply on an outing with his family, any justification for the stop had dissipated and Peters was required to end the detention without running a license and warrants check.  Id. at 44-49.

The Magistrate Judge denied the motion to suppress and ruled: "I find that Ranger Peters acted with probable cause on this occasion, and I find that his conduct was not only not in violation of the Fourth Amendment, but was in line with what we would expect from a competent law enforcement officer under the circumstances."  Id. at 50.   Dix entered a conditional plea of guilty and reserved the right to appeal the denial of the motion to suppress.  This appeal followed.

## SCOPE OF REVIEW

An appeal from a criminal conviction imposed by a Magistrate Judge lies with a "judge of the district court and must first be brought in the district court before prosecution in the court of appeals."  United States v. Soolook, 987 F.2d 574, 575 (9th Cir. 1993); see also 18 U.S.C. § 3402.  The district court's review of the magistrate's judgment is governed by the same standards as an appeal from a judgment of a district court to the court of appeals.  Fed. R. Crim. P. 58(g)(2)(D);United States v. McFarland, 369 F.Supp.2d 54, 56-57 (D. Me. 2005); United States

4

v. Fautanu, 751 F.Supp. 1420, 1421 (D. Haw. 1990); United States v. Ramirez, 555 F.Supp. 736, 738-739 (E.D. Cal. 1983).  In other words, the district court "is to apply the same scope of review as a United States Circuit Court of Appeals would apply in considering an appeal of a judgment from a United States District Court." United States v. Charrington, 285 F. Supp. 2d 1063, 1066 (S.D. Ohio 2003).

Accordingly, the court will review de novo a denial of a motion to suppress as to issues of law, while the lower court's factual findings are reviewed for clear error.  United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005); United States v. Bynum, 362 F.3d 574, 578 (9th Cir. 2004).  Review under the clearly erroneous standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed." United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc).  A denial of a motion to suppress may be affirmed "on any ground fairly supported by the record." United States v. Koshnevis, 979 F.2d 691, 695 (9th Cir. 1992); United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986).  "When a [lower] court does not enter a specific finding, [the reviewing court] will uphold the result if it is reasonably supported in the record." Koshnevis, 979 F.2d at 694; United States v. Gomez, 846 F.2d 557, 560 (9th Cir. 1988).  The evidence in the record is viewed "in the light most likely to support the [lower] court's decision." Gomez, 846 F.2d at 560.  A determination whether a legal detention exceeds its proper scope and duration is an issue reviewed de novo.  United States v. Mayo, 394 F.3d 1271, 1276 n.8 (9th Cir. 2005).

## ARGUMENTS

*Appellant's Argument*

Appellant argues that merely observing a vehicle driving below the speed limit, weaving once within a lane of traffic, and crossing the center lane-line on a one-way road in a national park is insufficient to establish probable cause that a traffic infraction has occurred or reasonable suspicion that the driver is under the influence of alcohol or drugs.  Appellant cites a number of cases that hold crossing a dividing line or a fog line once or twice over a relatively short distance

is insufficient to objectively create reasonable suspicion or probable cause of a traffic violation. The basis for this stop would apply to a large category of innocent travelers and thus, cannot form the basis for reasonable suspicion.  Further, assuming *arguendo* that such observations did create a reasonable suspicion of driving under the influence, once Peters determined that the driver was not impaired, the Fourth Amendment required Peters to terminate the stop.  According to Peters's testimony, the stop was to determine whether Dix was driving under the influence. When Peters demanded Dix's license, registration, and proof of insurance and ran a license and warrants check, after dispelling suspicion of DUI and in the absence of additional grounds for suspicion, the prolonged duration and expanded scope of the vehicle stop exceeded that permitted by *Terry v. Ohio*.  Peters requested Dix's driver's license, registration, and proof of insurance after determining that Dix was not intoxicated.  Because the detention continued after any suspicion of driving under the influence dissipated and expanded beyond investigating driving under the influence, Dix's rights were violated.  See United States v. McSwain, 29 F.3d 558, 561-62 (10th Cir. 1994).  Since all of the Government's incriminating evidence of driving with a suspended license was obtained well after the time that any suspicion had dissipated, Appellant argues that the evidence was fruit of the poisonous tree and should have been suppressed.

### *Appellee's Argument*

The Government argues that Ranger Peters had probable cause to believe that Dix had violated California Vehicle Code § 5200, which requires an individual to attach license plates that have been issued for vehicle on that vehicle.[3]  That section further provides that if only one license plate is issued, that plate is required to be attached to the rear of the vehicle.  Cal. Veh.

---

[3] 36 C.F.R. § 4.2 reads, "(a) Unless specifically addressed by regulations in this chapter, traffic and the use of vehicles within the park area are governed by State law.  State law that is now or may later be in effect is adopted and made a part of the regulations in this part. (b) Violating a provision of State law is prohibited."  This provision indicates that California Vehicle Code § 5200 is incorporated as part of the traffic laws/regulations applicable in Yosemite National Park.  Appellant makes no argument that California Vehicle Code § 5200 is somehow not applicable in Yosemite National Park.

6

Code § 5200.  When Peters saw that the truck had no rear license plate, Peters had probable cause to make a traffic stop.  Further, Peters observed the truck engage in erratic driving behavior, each of which constituted moving violations.  Driving over the four inch concrete barrier/curb and onto the bike path violated 36 C.F.R. § 4.10(a), which prohibits operating a motor vehicle except on park roads, parking lots, and designated off-road areas, and 36 C.F.R. § 4.12, which deals with failing to obey traffic control devices.  Also, stopping on the bike violated 36 C.F.R. § 4.2, which prohibits, *inter alia*, parking or placing a vehicle on a bike path so as to impede or block the reasonable movement cyclists unless parking is necessary for "safe operation."

      Also, even if there was not probable cause, there was at least reasonable suspicion to believe that Dix was driving while impaired.  In addition to weaving in the left lane, Peters also observed that Dix was traveling 10 to 15 m.p.h. below the speed limit, there was no rear license plate, Dix drove over a four inch curb while pulling off the roadway, and stopped his truck partially on the road and partially on a bike path even though Southside Drive had two lanes.  The facts, taken together and based on Peters's training and experience, led Peters to have a reasonable suspicion that Dix was driving while impaired.

      Further, the Government argues that the traffic stop did not exceed its reasonable scope.  Peters stopped the truck for failure to display a rear license plate and upon suspicion of operating a vehicle while impaired.  Peters explained why he had stopped Dix, asked if Dix had consumed drugs or alcohol, and after Dix answered negatively, requested Dix's license and registration.  Asking for license, registration, and proof of insurance is an appropriate question while investigating a traffic violation.  When Dix produced the driver's license, Peters saw that it was expired.  This new information warranted further investigation, and Peters was justified in radioing dispatch and continuing the detention.  When Peters asked for the driver's license, the investigation into driving while impaired was still on-going and Peters had not yet asked about other violations, specifically the failure to display a rear license plate.

*Appellant's Reply*

Dix replies that using the absence of a rear license plate as a basis for the stop is improper because Ranger Peters merely *thought* that he had observed a traffic violation. However, further investigation showed that Dix was in compliance with the law. Further, justification for the stop based on § 5200 evaporated as soon as Peters observed the temporary registration on the front window. Once the first question that Peters asked established that Mr. Dix had a valid vehicle registration sticker, Peters no longer had a legal basis to continue Dix's detention. More importantly, citing to pages 14 and 20 of the transcript, Dix argues that Peters saw the temporary registration sticker on the front windshield as he approached the truck. See Appellant's Reply Brief at 3:20-21. Thus, the chronology was that Peters saw the temporary registration, then continued to question Dix, then requested license and registration. Id. at 6:22-27.

Further, Peters testified that he asked for license and registration as part of a one-size-fits-all standard policy and not in connection with the driving while impaired investigation. This is contrary to the Fourth Amendment which requires a warrantless seizure to be justified under the particular circumstances of a case. Because it was apparent that Dix was not impaired and Peters had observed the temporary sticker on the windshield before requesting the driver's license, there was no grounds to continue the detention.[4]

---

[4] Peters denied that the stop was a DUI investigation, but instead was an impairment investigation. Suppression Hearing Transcript at 25:25-26:3. The parties have not directed the Court to an offense entitled Driving While Impaired. Instead, the Court has found 36 C.F.R. § 4.23, which applies in Yosemite National Park and prohibits operating a motor vehicle under the influence of alcohol or drugs. 36 C.F.R. § 4.23 reads in relevant part:

(a) Operating or being in actual physical control of a motor vehicle is prohibited while:
(1) Under the influence of alcohol, or a drug, or drugs, or any combination thereof, to a degree that renders the operator incapable of safe operation; or
(2) The alcohol concentration in the operator's blood or breath is 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath. Provided however, that if State law that applies to operating a motor vehicle while under the influence of alcohol establishes more restrictive limits of alcohol concentration in the operator's blood or breath, those limits supersede the limits specified in this paragraph.
(b) The provisions of paragraph (a) of this section also apply to an operator who is or has been legally entitled to use alcohol or another drug.

When he stopped Dix, Peters asked if Dix had taken any drugs or alcohol. Since the parties do not argue otherwise, it appears that the applicable statute that implicates "driving while impaired" is 36 C.F.R. § 4.23. Accordingly, any

**LEGAL STANDARD**

"The 'touchstone of the Fourth Amendment is reasonableness,'" and the proper function of the Fourth Amendment "'is to constrain, not against all intrusions . . . but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'" United States v. Willis, 431 F.3d 709, 714 (9th Cir. 2005) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991) and Schmerber v. California, 384 U.S. 757, 768 (1966)). Traffic stops are seizures and subject to the Fourth Amendment's reasonableness requirement. See United States v. Arvizu, 534 U.S. 266, 273 (2002); Delaware v. Prouse, 440 U.S. 648, 653-55 (1970). Although an investigatory traffic stop is justified if a police officer has probable cause to believe that an offense has occurred,[5] "the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops." United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir. 2000); see also Willis, 431 F.3d at 717; United States v. Miguel, 368 F.3d 1150, 1153 (9th Cir. 2004). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Miguel, 368 F.3d at 1153; Lopez-Soto, 205 F.3d at 1105. A police officer's inferences must "be grounded in objective facts and be capable of rational explanation." Lopez-Soto, 205 F.3d at 1105. Reasonable suspicion is determined by examining the "totality of the circumstances" and by considering "all relevant factors" to see whether the officer had a "particularized and objective basis" for suspecting criminal activity. Arvizu, 534 U.S. at 273; United States v. Fernandez-Castillos, 324 F.3d 1114, 1117 (9th Cir. 2003); United States v. Colin, 314 F.3d 439, 442 (9th Cir. 2002). "Officers are encouraged to draw upon their own specialized training and experience in assessing the 'totality of the circumstances.'" Colin, 314 F.3d at 442 (citing Arvizu, 534 U.S. at 273); Lopez-Soto, 205 F.3d

---

further reference to "driving while impaired" or "driving under the influence" will refer to 36 C.F.R. § 4.23.

[5]"Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." United States v. Ortiz-Hernandez, 427 F.3d 567, 573 (9th Cir. 2005).

at 1105. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." Arvizu, 534 U.S. at 277. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990); see also Arvizu, 534 U.S. at 273-74.

However, even if reasonable suspicion exists to initiate an investigative detention, "the scope of an investigative detention must be carefully tailored to its underlying justification . . . and may last no longer than is necessary to effectuate the purpose of the stop." United States v. Chavez-Valenzuela, 268 F.3d 719, 724 (9th Cir. 2001), amended by 279 F.3d 1062 (9th Cir. 2002); United States v. Flores, 359 F.Supp.2d 871, 875 (D. Ariz. 2005). "An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop." Chavez-Valenzuela, 268 F.3d at 724; Flores, 359 F.Supp.2d at 875; see also United States v. Garcia-Rivera, 353 F.3d 788, 791 (9th Cir. 2003) ("Questions asked during an investigative stop must be reasonably related in scope to the justification for their initiation."). "An officer may, however, broaden the line of questioning if there are additional particularized and objective factors arousing suspicion." Garcia-Rivera, 353 F.3d at 791; Chavez-Valenzuela, 268 F.3d at 724. Generally, where an officer has reasonable suspicion that a traffic violation has occurred and has initiated an investigatory stop, the officer may request to see a driver's license and vehicle registration without offending the Fourth Amendment. See United States v. Hanlon, 401 F.3d 926, 928 (8th Cir. 2005); Chavez-Valenzuela, 268 F.3d at 724; United States v. White, 42 F.3d 457, 459 (8th Cir. 1994); Flores, 359 F.Supp.2d at 876; cf. Garcia-Rivera, 353 F.3d at 791 (finding that scope of questions was properly expanded after request for driver's license was made during a traffic stop for a cracked windshield).

## DISCUSSION

*Initial Detention*

The magistrate did not make express findings of fact, but did hold that probable cause existed in denying the motion to suppress. It is not necessary to determine if probable cause existed for the initial detention as reasonable suspicion is all that is necessary for an investigatory traffic stop. Lopez-Soto, 205 F.3d at 1104-05. Reviewing the record in the light most favorable to the magistrate court's ruling, there is at least reasonable suspicion for Dix's initial detention.

First, it is undisputed that Dix's truck did not have a rear license plate attached to it when Peters made the stop. It is also undisputed that California Vehicle Code § 5200 requires that license plates issued for a vehicle must be attached to the vehicle, and if only one plate is issued, that plate must be attached to the rear of the vehicle. Cal. Veh. Code § 5200.[6] Further, Peters testified at the hearing that, in the past, he had made stops based on his observation that a vehicle did not have rear license plate. Although further investigation by Dix revealed that the truck was recently purchased and that Dix was in compliance with the law because there was a temporary registration sticker on the front windshield, that does not change the analysis. At the time Peters made the stop, the record does not indicate that he was aware of the temporary windshield registration sticker. All Peters knew was that the truck did not have a rear license plate, which clearly implicated Vehicle Code § 5200.[7] Based on his experience and the surrounding circumstances, Peters had at least an articulable reasonable suspicion that Dix was in violation of

---

[6] California Vehicle Code § 5200 in its entirety reads:

(a) When two license plates are issued by the department for use upon a vehicle, they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear.
(b) When only one license plate is issued for use upon a vehicle, it shall be attached to the rear thereof, unless the license plate is issued for use upon a truck tractor, in which case the license plate shall be displayed in accordance with Section 4850.5.

[7] Appellant does not argue that it is not a violation of Vehicle Code § 5200 for a person who is issued a license plate to not display that license plate on the rear of the vehicle. Accordingly, this is not a situation where Peters misunderstood both the law and the facts. See, e.g., United States v. King, 244 F.3d 736, 738-39 (9th Cir. 2001) (discussing the effect of potential officer "misunderstandings" or "mistakes" on reasonable suspicion determinations). Where an officer has a correct understanding of the law but has a good-faith error regarding the facts, reasonable suspicion may still be established. Id. at 739.

11

Vehicle Code § 5200.

Additionally, under the totality of the circumstances, Peters had reasonable suspicion that Dix was driving while impaired. Alone, swerving within the left lane, then slightly across into the right line, and then back towards the left fog line may not create reasonable suspicion. However, more occurred than merely isolated weaving. The truck was driving 10 to 15 m.p.h. below the speed limit, it was 10:00 p.m., and the truck switched lanes and then continued until it drove partially over the four inch concrete curb. The truck then came to a stop partially on the road and partially on the bike path, and the driver motioned for Peters to pass. The behavior is unusual in that Southside Drive has two lanes that go in the same direction. It was unnecessary for the truck to drive partially over the curb and stop with the passenger side tires on the bike path because Peters could have passed in the left lane without assistance. It is true that O'Hara denied that the truck ever stopped or drove over the curb, but the magistrate was entitled to believe Peters. See Gomez, 846 F.2d at 560-61. The totality of the circumstances, driving slowly, some weaving in the left lane, driving over the concrete curb without reason, stopping partially on the bike path, and motioning Peters to go passed, all occurring around 10:00 p.m., create at least an articulable reasonable suspicion that Dix was driving under the influence or driving while impaired. The initial detention did not offend the Fourth Amendment.

*Duration and Scope of Detention*

Dix argues that any reasonable suspicion that Vehicle Code § 5200 was violated or that Dix was driving while impaired dissipated before Peters asked for a license and registration. With respect to driving while impaired, it is true that Peters testified that Dix did not have slurred speech and did not smell of alcohol and that a woman and two small children were present. However, these factors, combined with the denial of having consumed alcohol or drugs, is not enough to completely dissipate Peters's suspicion. The absence of slurred speech and the presence of a family does not foreclose the possibility that Dix may have consumed something other than alcohol. More importantly, the denial does not explain why Dix was driving in a way

that created a reasonable suspicion that he was driving while impaired.  Further investigation was warranted.  Since reasonable suspicion had not completely dissipated, it was reasonable for Peters to ask for Dix's license and registration as part of the investigation into the potential traffic offense of driving while impaired or under the influence.  See 36 C.F.R. § 4.23; Hanlon, 401 F.3d at 928;  Chavez-Valenzuela, 268 F.3d at 724; White, 42 F.3d at 459; Flores, 359 F.Supp.2d at 875-76; cf. Garcia-Rivera, 353 F.3d at 791.

Moreover, even if reasonable suspicion had completely dissipated after Dix denied having consumed drugs or alcohol, reasonable suspicion for the rear license plate violation had not dissipated.  Dix argues that Peters saw the temporary sticker as Peters approached the vehicle and before Peters asked for the license and registration.  Dix cites to pages 14 and 20 of the suppression hearing transcript (testimony by Peters) in support of this assertion.  Pages 13 and 14 read in pertinent part:

> **A:** **I asked the passenger to roll down the window and identified myself to the driver, and explained the reason for the stop, the reason being that I suspected based on his erratic driving behavior that he may be operating a motor vehicle while impaired.  I asked the driver if he was under the influence of drugs and/or alcohol.**
>
> Q: And . . . did he comply?
>
> **A:** **He adamantly stated no, he didn't do drugs, and he was not under the influence of alcohol.**
>
> Q: What additional requests did you make of [Mr. Dix]?
>
> **A:** **I requested to see his driver's license, registration, and proof of insurance.**
>
> Q: And what documents did he provide to you?
>
> **A:** **The driver indicated that the vehicle had recently been purchased, but there was a temporary registration supplied by the dealer on the front right-hand corner of the windshield as well as there was - - and the driver provided me with valid proof of insurance and an expired driver's license.**
>
> Q: The – how did you know the driver's license appeared to be expired?
>
> **A:** **The driver's license expiration date printed upon it was that it had expired as of the year 2000.**

Suppression Hearing Transcript at 13:24-14:20.

Similarly, Page 20 reads in relevant part:

Q:   Now, you also testified that his vehicle didn't have a rear license plate?

**A:   Yes.**

Q:   Did you issue him a citation for that infraction?

**A:   No, because upon further investigation, I revealed that the vehicle was in compliance.**

Q:   Because it's a 2004 truck, and it had a temporary registration?

**A:   It had a temporary registration.**

Q:   It had been recently purchased and had a temporary registration?

**A:   Yes.**

Id. at 20:13-24.

The excerpts do not support the assertion that Peters saw the temporary registration sticker before he asked for the license and registration. In fact, the record indicates that Peters had to be told that the truck was new and that the truck had a temporary registration sticker on the front windshield. See id. at 14. The record indicates that after Peters asked for the license and registration, he was told about the temporary registration and given the driver's license roughly contemporaneously. The record "is viewed in the light most likely to support the [lower] court's decision." Gomez, 846 F.2d at 560. The record does not indicate that Peters saw the temporary registration sticker before requesting the driver's license and registration; thus, reasonable suspicion regarding a violation of Vehicle Code § 5200 had not dissipated. It was reasonable for Peters to ask for Dix's license and registration in connection with investigating the potential traffic offense of driving without a rear license plate.[8] See Cal. Veh. Code § 5200;

---

[8] The *McSwain* case is distinguishable. In *McSwain*, a police officer in Utah stopped McSwain because he could not read the temporary registration sticker on the front windshield and the sticker appeared to be covered with reflective tape. McSwain, 29 F.3d at 560. After the officer made the stop and approached the vehicle, he saw that registration sticker was from Colorado, that the reflective tape was actually part of the sticker, and that the registration was valid. Id. Since the only apparent traffic violation was the possible invalidity of the temporary registration sticker, reasonable suspicion/probable cause immediately dissipated when the officer saw the sticker was valid. Id. at 561. The *McSwain* court held that since reasonable suspicion had dissipated before any contact was made with the driver, continued detention and questioning, including requesting license and registration, was

Hanlon, 401 F.3d at 928; Chavez-Valenzuela, 268 F.3d at 724; White, 42 F.3d at 459; Flores, 359 F.Supp.2d at 876; cf. Garcia-Rivera, 353 F.3d at 791.

There appears to be no dispute that the license was expired on its face. Especially considering Dix's driving behavior, being provided with a driver's license that indicates that it expired approximately four years prior provides probable cause that Dix was driving without a valid driver's license. The facially expired license itself provides at least reasonable suspicion that Dix was driving without a valid license. The facially expired license was new information that warranted further investigation and detention. See Garcia-Rivera, 353 F.3d at 791; Chavez-Valenzuela, 268 F.3d at 724. It was reasonable for Peters to radio dispatch in order to obtain further information about the license. It was also reasonable for Peters to ask Dix if Dix knew that the license was suspended once dispatch had so informed Peters. See Garcia-Rivera, 353 F.3d at 791; Chavez-Valenzuela, 268 F.3d at 724. Also, there is no indication in the record that obtaining the additional information from dispatch took an unreasonable amount of time. Peters's conduct once he obtained Dix's driver's license was reasonable.

## CONCLUSION

After reviewing the record, Ranger Peters's testimony indicates that the initial detention of Dix was based on at least reasonable suspicion. Because there was no rear license plate, Peters had reasonable suspicion that Dix was in violation of Vehicle Code § 5200. Further, because Dix was driving 10 to 15 m.p.h. below the speed limit, weaved in his lane, switched lanes and drove over the four inch curb without reason, came to a stop partially on the road and partially on a bike path, and motioned for Peters to go around even though a second lane was available for passing, all occurring around 10:00 p.m., provided reasonable suspicion that Dix was driving while impaired. Furthermore, the record indicates that reasonable suspicion had not

---

unreasonable. Id. Here, however, reasonable suspicion for both driving without a rear license plate and driving while impaired had not dissipated by the time Peters asked for, and was given, Dix's driver's license. Cf. id. at 560-61.

fully dissipated by the time Peters requested Dix's driver's license and registration, and it is generally reasonable to request a license and registration in the course of investigating a traffic offense. Finally, the face of Dix's driver's license indicated that it had expired. This provided a proper basis to continue the detention and investigate the offense of driving without a valid license. There is no indication that the additional questioning or obtaining information from dispatch took an unreasonable amount of time. Viewing the record in the light most favorable to the magistrate court's ruling, the record supports the magistrate's denial of the motion to suppress.

Accordingly, the Magistrate Court's denial of Appellant's Motion to Suppress is AFFIRMED and this case is remanded to the Magistrate Court for further proceedings.

IT IS SO ORDERED.

**Dated:   February 8, 2006**            /s/ **Anthony W. Ishii**
0m8i78                                              UNITED STATES DISTRICT JUDGE